Submitted July 31, 2008, reversed and remanded on DUII conviction; otherwise affirmed March 11, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM GENE TYON, JR.,
*Defendant-Appellant.*

Malheur County Circuit Court
05116699C; A134110

204 P3d 106

Peter Gartlan, Chief Defender, Legal Services Division, and Ryan T. O'Connor, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the brief for respondent.

Before Rosenblum, Presiding Judge, and Brewer, Chief Judge, and Richardson, Senior Judge.

ROSENBLUM, P. J.

## ROSENBLUM, P. J.

Defendant appeals his convictions for driving under the influence of intoxicants (DUII), ORS 813.010, and refusal to take a breath test, ORS 813.095. Defendant assigns error to the trial court's exclusion of evidence of the arresting officer's alleged bias. Defendant also asserts that he was denied a reasonable opportunity to consult with counsel in private before deciding whether to submit to an Intoxilyzer (breath) test and, thus, that the trial court erred in denying his motion to suppress evidence of his refusal. We conclude that the trial court did not err in denying defendant's motion to suppress his refusal to submit to a breath test; however, we conclude that the court erred in excluding evidence of the arresting officer's alleged bias. Accordingly, we reverse defendant's conviction for DUII and affirm his conviction for refusal to take a breath test.

We take the following facts from the record of the suppression hearing and the trial, which includes a DVD created by the arresting officer, Trooper Morehead of the Oregon State Police, by means of a dashboard camera, a video camera at the Malheur County Jail, and a microphone worn on Morehead's uniform.

In November 2005, Morehead stopped defendant after observing him speeding. Morehead approached the driver's side window of defendant's vehicle and informed him that he was being recorded. Morehead testified at trial that he smelled the odor of an alcoholic beverage coming from the vehicle, that defendant fumbled with his paperwork, and that he had slurred speech and bloodshot, watery eyes. Defendant denied having consumed any alcohol.

Despite defendant's denial, Morehead believed that he had been driving under the influence of intoxicants and asked defendant if he would be willing to perform field sobriety tests. Defendant agreed, and Morehead administered the horizontal gaze nystagumus (HGN) test. Morehead testified at trial that defendant displayed all six signs of being under the influence that the HGN tests for. Morehead arrested defendant for DUII, and defendant immediately requested to speak with his attorney, Rader.

Rader had represented defendant in a different DUII proceeding a few years earlier that resulted in an acquittal. Apparently, Rader had given defendant his home phone number and had told him to call if he had any problems in the future. Morehead had served as the back-up security officer to the officer who had arrested defendant in that case. Morehead had had only minimal contact with defendant at that time, but, when questioned later, Morehead testified that he believed that defendant had been under the influence of intoxicants when he was arrested in that case.

At 12:22 a.m., defendant and Morehead arrived at the Malheur County Jail, where Morehead placed defendant in a holding cell with a telephone and a phone book. Morehead then told defendant that he could call his attorney. Morehead recorded the events at the jail by setting up a video camera that faced the room adjacent to defendant's holding cell and continuing to wear the microphone on his uniform. Morehead turned off or muted the microphone for approximately 15 minutes of the 45-minute period that he gave defendant to attempt to contact an attorney. Morehead testified at trial that defendant was profane, belligerent, and loud at the jail.

Morehead and the jail staff, Deputy Harnden and Sergeant Gates, left defendant alone in the holding cell for almost all of the approximately 45 minutes that Morehead gave defendant to attempt to contact an attorney. Morehead told Harnden and Gates that he intended to give defendant 20 minutes to call an attorney. At 12:56 a.m., Morehead stated that he would give defendant an additional 10 minutes because the jail staff had, for a brief period, entered the holding cell and taken the jail phone to make sure that it was working and to help defendant make his phone calls. Morehead told another individual (not defendant or the jail staff) that he wanted to give defendant another 10 minutes to ensure that he had at least 20 minutes alone with the phone and phone book.

The phone provided by the jail staff was capable of making only collect calls. Defendant used the phone to call Rader's office, but he reached the after-hours recording. Defendant told Morehead and the jail staff that he wanted to

call Rader's home phone but that the phone number was in his girlfriend's purse. Defendant tried to call his girlfriend's cell phone but was unable to reach her.[1] At one point, defendant told the jail staff that he was unable to find Rader's home phone number in the phone book because he could not read the small print without his reading glasses. Harnden responded by offering to help defendant and entered the holding cell to do so, but Rader's home phone number was not listed. Harnden reminded defendant that he could call a different attorney, but defendant told him that he wanted to speak with Rader and that he did not want another attorney.

Defendant asserts on appeal that he told Morehead and the jail staff that the jail phone was unable to call cell phones. However, defendant's complaints were not—at least initially—sufficient to convey to the jail staff that he believed that his difficulties reaching his girlfriend and his attorney were related to the fact that the jail phone could only make collect calls. At 12:37 a.m., he told them that he was not able to call his girlfriend because she was "on a cell phone only." At 12:48 a.m., defendant stated, "I don't have [Rader's] phone number on me and I can't call his cell phone." At 12:49 a.m., defendant stated that he could not call his girlfriend because she was "on a cell phone and that's the only phone I got." At 1:06 a.m., defendant again told the jail staff that he wanted to contact his girlfriend to get his attorney's home phone number but that "it's a cell phone number and that's the only way I can get it."

In response, at 1:06 a.m., Gates offered to call defendant's girlfriend on a different phone. By that point, defendant had been in the holding cell with a phone and phone book for approximately 45 minutes. When Gates finally reached defendant's girlfriend on her cell phone, defendant acknowledged that the phone number was not in his girlfriend's purse but was instead "somewhere in the house." At that point, at approximately 1:08 a.m., Morehead called,

---

[1] It is unclear from the record whether the woman that defendant attempted to call was his wife or his girlfriend. The state refers to her as his wife, but defendant's trial and appellate counsel both refer to her as his girlfriend. We assume that defendant's attorneys are in a better position to know, so we follow their lead on that point.

"Time." Gates told defendant's girlfriend, "Never mind," and hung up the phone.

During the approximately 45-minute period, Morehead and the jail staff remained near the holding cell, in an adjacent room and another room connected to the adjacent room. The door between the holding cell and the adjacent room was closed, but there was an open cuff port (slot) in the door. The DVD recording reveals that, throughout the entire period, defendant, Morehead, and the jail staff were able to hear one another other through the door slot. Defendant shouted at times and spoke in a normal voice at times. Morehead and the jail staff murmured and whispered to each other. At one point, defendant told them that he could hear them whispering in the next room. Morehead and the jail staff never informed defendant that they would give him privacy once he reached his attorney by closing the cuff port or moving out of earshot of defendant.

After Morehead ended the attorney consultation period, he asked defendant if he would consent to a breath test. Defendant responded that he would not do so without his attorney present. Morehead recorded that response as a refusal and cited defendant for refusal to take a breath test.

Before trial, defendant moved to suppress evidence of his refusal to take a breath test, arguing that he was denied an opportunity to privately consult with an attorney before deciding whether to submit to a breath test. The trial court denied the motion and made the following findings:

"At the jail, defendant was belligerent, profane and uncooperative and loud. I should add that. A normal person talking in a normal tone of voice would probably not have been so easily heard * * *.

"* * * * *

"[The jail staff] gave him the opportunity to call whoever he wanted, including his [girlfriend,] other attorneys, Mr. Rader. And again, I will take judicial notice of the fact that other attorneys are listed in the local phone book, from personal knowledge.

"He—they even offered to look up numbers in the phone book for him. * * *

"* * * * *

"* * * In fact they called the attorney for him. They eventually called his [girlfriend], at his insistence, to ask her for the phone number after he had repeatedly said that his [girlfriend] had the phone number in her purse. When they reached the [girlfriend] it became apparent that he did not, in fact, know where the phone number was. * * *

"He was allowed 47 minutes to locate an attorney. The jail staff went above and beyond what was required to help him. And essentially a great deal of time was wasted when it appears the defendant didn't know where his—where the phone number actually was, if, in fact, he actually has it.

"* * * * *

"* * * as far as the privacy issue, the defendant did, in fact, never contact any attorneys. There's no indication they wouldn't have given him all the privacy that he wanted. They put him in a private room. All they would've had to do is close the cuff port or step away. The fact that the defendant was yelling in a loud voice isn't their fault. But it appears to me that they had every intention of offering him privacy."

After the court denied defendant's motion to suppress, the parties stipulated to the facts from the suppression hearing. Defendant was then convicted of refusal to take a breath test in a bench trial.

Before the jury trial on the DUII charge, the trial court granted the state's motion to exclude as not relevant evidence that defendant had been arrested in 2003 for DUII, that Morehead had served as a back-up security officer in that arrest, and that that proceeding had resulted in an acquittal. Defendant's counsel told the court that Morehead would testify that he had been present at the scene of the 2003 arrest, believed that defendant was under the influence of intoxicants at the time of his arrest, and knew that defendant had been acquitted. Defendant argued that the prior DUII arrest and Morehead's role in it were relevant to prove that Morehead was biased because he believed that defendant was guilty in the earlier DUII case, and it would be a reasonable inference that he wanted to make sure that defendant was convicted of DUII in this proceeding. That, in turn,

would call into question his credibility. The state argued, and the trial court agreed, that the evidence of Morehead's alleged bias was not relevant. The trial court then noted that allowing the evidence would require the jury to "retry" the 2003 case and to speculate as to why "another jury did whatever they did."

At trial, during defendant's cross-examination of Morehead, defendant presented an offer of proof on the issue of Morehead's alleged bias. Morehead testified in the offer as defendant's counsel had anticipated, stating that it was his belief that defendant had been under the influence when he was arrested for DUII in 2003 and that he knew that defendant had been acquitted in that proceeding. The trial court adhered to its earlier ruling excluding the bias evidence, stating that "it would just be simply retrying the other case and speculating as to why the jury acted as it did."

Gates's testimony at trial corroborated Morehead's observations that defendant smelled of alcohol and was profane, belligerent, and loud on the night of his arrest. Gates also testified that it was her opinion that defendant was intoxicated. In addition, the jury viewed substantial portions of the DVD during Morehead's testimony, which allowed it to hear defendant's speech and see defendant's appearance. The jury was also informed that defendant had refused to submit to a breath test. The state suggested that the jury infer that he refused because he knew that he was guilty.

Defendant testified in his own defense. He testified that, on the night of his arrest, he had had "a couple of sips" of his girlfriend's drink and that he had not tasted any alcohol in it, but later learned that it had contained whiskey. Defendant also testified that he had refused to submit to a breath test because he believed that he was entitled to have his attorney present.

In its rebuttal, the state recalled Morehead. He testified that, at a DMV hearing concerning the suspension of defendant's driver's license, defendant testified that he had had "a couple of drinks" on the night in question.

In the state's closing argument, the prosecutor argued that the case amounted to a credibility contest, stating, "Now it really comes down to who you believe." He acknowledged that defendant's conduct in his vehicle, before Morehead arrested him, is not visible on the DVD, but he asked the jury, "[W]hy would Trooper Morehead lie about that?" In defendant's closing argument, his attorney asserted that Morehead had rushed to judgment in concluding that defendant was under the influence, and he attacked the accuracy of Morehead's observations. The jury convicted defendant of DUII.

On appeal, defendant assigns error to the trial court's denial of his motion to suppress his refusal to submit to a breath test and to its ruling excluding evidence of Morehead's alleged bias. We begin with the motion to suppress.

■ We review for errors of law a trial court's denial of a motion to suppress based on its determination that a defendant was given a reasonable opportunity to consult with counsel before submitting to a breath test. *State v. Greenough*, 132 Or App 122, 125, 887 P2d 806 (1994). A defendant arrested for DUII has the right to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test. *State v. Spencer*, 305 Or 59, 74-75, 750 P2d 147 (1988). Because of the importance of confidentiality to attorney-client communications, a defendant who invokes his or her right to counsel under Article I, section 11, of the Oregon Constitution must be afforded an opportunity to speak privately with an attorney. *State v. Durbin*, 335 Or 183, 190-91, 63 P3d 576 (2003). Privacy in this context is an "opportunity for confidential communication." *Id.* at 191.

■■ The right to a reasonable opportunity to consult with an attorney in private before submitting to a breath test is not unlimited. *State v. Matviyenko*, 212 Or App 125, 129, 157 P3d 268 (2007). As the Supreme Court held in *Spencer*, "[b]ecause evidence of an arrested driver's blood alcohol dissipates over time, the state is not required to wait for a long period of time before administering the test." 305 Or at 75. The Supreme Court noted that "a period of 15 minutes after

the request to take the test has been made will doubtless suffice in most cases." *Id*. Moreover, a defendant has no absolute right to reach an attorney—only the right to a reasonable opportunity to do so. *State v. Brazil-Kay*, 137 Or App 589, 594, 907 P2d 1116, *rev den*, 323 Or 484 (1996).

■ We first address defendant's contention that he was denied a *reasonable opportunity* to consult with an attorney, before we address his argument that he was denied an opportunity to consult with an attorney *in private*. We conclude that he was afforded a reasonable opportunity to consult with an attorney. Defendant was provided with a working phone, a phone book, and approximately 45 minutes to use them. In fact, he succeeded in contacting his attorney's office, but, after reaching the after-hours recording, chose not to attempt to contact any other attorneys listed in the phone book. Instead, he decided to keep trying to contact Rader by attempting to find his home phone number—an attempt that ultimately failed.

Defendant did not know Rader's home phone number, and it was not listed in the local phone book. Defendant told the jail staff that he had the number in his wallet and that his wallet was in his girlfriend's purse. He did not reach her until the end of the 45-minute period when Gates contacted her for him. Only then did defendant acknowledge that the number was not in his wallet but was in fact in some unknown location in the house. As planned approximately 10 minutes earlier, Morehead ended the attorney consultation period because evidence of defendant's intoxication was dissipating and defendant had been given a reasonable opportunity to contact an attorney.

The Supreme Court noted in *Spencer* that 15 minutes to find and consult with an attorney would be reasonable in most cases. 305 Or at 75. At the time that Morehead ended the attorney consultation period, defendant was still looking for his attorney's phone number; thus, even assuming that defendant's girlfriend could have quickly searched the house and found Rader's home phone number, defendant would have needed more time to call his attorney and consult with him. Morehead was not constitutionally required to give defendant more time to continue his efforts

to reach his attorney because he had already given defendant a reasonable amount of time to seek legal advice either from his chosen attorney or another attorney.

■ Defendant argues that, because the jail phone could not call his girlfriend's cell phone, we should begin our calculation of the attorney consultation period when Gates called defendant's girlfriend on the regular jail phone. Thus, according to defendant, the attorney consultation period was only one or two minutes because we should not count any part of the 45-minute attorney consultation period when defendant only had use of the "collect only" jail phone. Even accepting the rest of defendant's argument—that he was unable to call his girlfriend collect and was therefore unable to get his attorney's home phone number from her—it is not the state's responsibility to ensure that anyone whom defendant chooses to call will have a phone that accepts collect calls. Moreover, defendant did not raise the issue of his apparent inability to call a cell phone from the jail until he had already been given a reasonable amount of time to contact an attorney. Once defendant had alerted them to the problem, Gates went beyond what was constitutionally required by calling defendant's girlfriend for him.

Put simply, defendant chose not to call any of the other attorneys in the phone book or anyone else who may have known or been able to find Rader's home phone number. The fact that it was late at night and attorneys' offices were likely to be closed does not mean that Morehead and the jail staff deprived defendant of his right to an opportunity to consult with an attorney. The additional fact that defendant, after all, did not know the location of his attorney's home phone number similarly does not indicate deprivation of his right to a reasonable opportunity to consult with an attorney.

■ Defendant also contends that he was denied the means to contact an attorney because he could not read the phone book without reading glasses. We reject that argument because the jail staff offered to help defendant read the entries in the phone book. Because defendant was given both the time and the means necessary to locate and contact an attorney, we conclude that he was afforded his constitutional right to a reasonable opportunity to consult with an attorney.

We next turn to defendant's contention that he was not accorded privacy in attempting to reach his attorney. Because privacy is the "opportunity for confidential communication," *Durbin*, 335 Or at 191, defendant contends that the fact that Morehead and the jail staff remained within earshot while he attempted to contact his attorney and never told defendant that he would be given privacy once he reached an attorney violated his right to a private consultation with an attorney. However, the constitutional problem in *Durbin* was that the officer stayed in the room, within earshot, during the actual conversation between the defendant and his attorney. In that case, the state argued that there was no violation of the defendant's right to counsel because there was no evidence that the defendant's ability to consult with his attorney was chilled by the officer's presence. The Supreme Court held that the defendant was not required to make a showing that he felt chilled. *Id.* at 192. In so holding, the Supreme Court stated, "[W]e will not speculate here as to the effect of the arresting officer's presence on defendant's communications with his lawyer or defendant's decision to take the breath test." *Id.*

Similarly, in *Matviyenko*, we held that, if an officer intends to remain in the room while a defendant attempts to contact an attorney, the officer must inform the defendant that, once he or she contacts an attorney, privacy will be afforded. 212 Or App at 130. In *Matviyenko*, the officer stayed in the room with the defendant, who then decided not to try to call an attorney. We noted that a person under those circumstances could reasonably conclude that the officer intended to remain in the room for the duration of the calls, and that such a person would rightly assume that any statements made in the officer's presence would not be confidential and thus would be inclined not to make the call. We therefore held that the defendant's right to consult privately with an attorney was violated. *Id.* at 131.

This case is distinguishable from *Durbin* because the defendant in that case actually contacted his attorney and, at that point, the officer declined to give the defendant privacy in consulting with his attorney. Under those circumstances, we presume that there was a chilling effect and thus

do not require the defendant to prove that there was. However, where, as in this case and in *Matviyenko*, the defendant never actually contacts an attorney, the potential chilling problem pertains to the defendant's decision whether to continue trying to make the call.

That concern is not present in this case, because the record demonstrates that defendant was not deterred from trying to call his attorney. His efforts to do so continued unabated until Morehead intervened by calling "Time." The officers' failure to inform defendant that he would have been afforded privacy had he actually contacted his attorney did not have the chilling effect that we identified in *Matviyenko*. We do not have to speculate as to the effect of Morehead's and the jail staff's presence within earshot of defendant because we know that it did not have any effect—defendant never stopped trying to reach his attorney during the attorney consultation period. Thus, defendant's right to consult privately with an attorney was not violated. Because Morehead and the jail staff did not violate defendant's right to a reasonable opportunity to consult with an attorney in private before deciding whether to submit to a breath test, defendant's refusal to submit to a breath test is admissible as evidence. The trial court did not err in denying defendant's motion to suppress.

 We turn to defendant's assignment of error relating to the trial court's exclusion of evidence of Morehead's alleged bias. We review for errors of law a trial court's decision to exclude evidence that establishes sufficient facts from which bias or interest of a witness may be inferred. *State v. Najibi*, 150 Or App 194, 204, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998) ("Where the court's decision to curtail questioning is made before bias or interest is shown, we review the court's decision for error of law."). Under OEC 609-1, "[t]he credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest." Evidence of bias is relevant if it has a "mere tendency to show bias or interest of the witness." *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984).

The state contends that evidence of Morehead's role in the prior arrest, including his opinion of defendant's sobriety then and his knowledge of the outcome of the case, was

not admissible as impeachment evidence under OEC 609-1. The state asserts that Morehead was only the back-up officer in the prior arrest, did not perform any field sobriety tests on defendant at that time, and expressed that it was only his "gut opinion" that defendant was under the influence of intoxicants at the time that he was arrested. In the state's view, those facts do not give rise to an inference that Morehead was biased against defendant.

We disagree. Morehead knew that defendant had been acquitted in the 2003 DUII proceeding and he believed, based on his own observations, that defendant had been driving under the influence of intoxicants. As defendant asserts, Morehead's belief that defendant had been guilty of DUII and his knowledge that he had escaped conviction could have allowed the jury to infer that Morehead's observations and testimony would be colored by his desire to ensure defendant's conviction in this case. The excluded evidence had a "tendency to show bias." *Hubbard*, 297 Or at 796. Thus, the trial court erred in determining that the evidence was not relevant impeachment evidence.

The state also argues that, even if the evidence was relevant, the trial court properly exercised its discretion under OEC 403 to exclude the evidence of Morehead's bias. The trial court commented that allowing the evidence would cause the jury to speculate on why defendant was acquitted in the 2003 DUII. It further remarked that the earlier case would, in essence, have to be retried and that confusion would ensue. We conclude that, to the extent that the trial court relied on OEC 403, it erred. Relevant evidence may be excluded under OEC 403 if its probative value is substantially outweighed by considerations of prejudice, undue delay, confusion of issues, or misleading the jury. However, in the context of excluding relevant evidence of a witness's bias, the trial court may exercise its discretion to exclude the evidence on that ground only if it gives the party the opportunity to introduce other evidence from which bias may be inferred. *Hubbard*, 297 Or at 800 ("[T]he cross-examiner must be given the opportunity to establish sufficient facts from which bias or interest may be inferred, because it is always permissible to show bias or interest. * * * [W]here the questioning is curtailed before bias or interest is shown, the

decision is an error of law."). "In other words, the court's discretion to limit impeachment evidence that goes to interest or bias applies only to evidence that amplifies, develops, or elaborates an 'initial showing.' " *State v. Shelly*, 212 Or App 65, 69, 157 P3d 243 (2007). Here, the trial court prohibited the entire line of questioning.

Moreover, the trial court's concern—that admitting evidence of the 2003 DUII arrest would necessitate retrying the other case—was unfounded. Nothing about the reasons for defendant's previous acquittal was relevant to showing Morehead's bias. Defendant merely had to establish that Morehead *believed* that defendant had been driving under the influence in the prior proceeding and knew that he had been acquitted. Presenting that evidence to the jury would not have unduly delayed the trial or confused the jury. We decline the state's invitation to affirm under OEC 403.

■ ■ Having determined that the trial court erred in excluding evidence of Morehead's alleged bias, we address the question of harmless error. An error is harmless if there is "little likelihood that the particular error affected the verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The Supreme Court, in concluding that the exclusion of evidence tending to show an arresting officer's bias is not harmless, has stated that the error is reversible if

> "it denie[s] the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial. * * * [W]here the impeached witness is the sole witness on a given issue and there is no corroborating evidence, the interests of a fair trial require that the adverse party be given ample opportunity to establish the witness' bias or interest."

*Hubbard*, 297 Or at 800-01. Our task is not to weigh the evidence and determine defendant's actual guilt or innocence; instead, we assess whether the "particular issue to which the error pertains has [a] relationship to the jury's determination of its verdict" and, if so, the likelihood that the error affected the verdict. *Davis*, 336 Or at 32.

■ The state contends that any error in excluding evidence of Morehead's alleged bias was harmless because

the jury could assess Morehead's credibility by observing his demeanor at trial and could view the DVD of Morehead's interactions with defendant to determine whether Morehead's testimony was consistent with the DVD. In addition, it notes that certain portions of his testimony were corroborated by the jail staff.

We agree that there is some corroboration. However, the most critical part of Morehead's testimony tending to support his conclusion that defendant was under the influence—the HGN test results—is not corroborated by any other testimony or the DVD. Although the DVD shows Morehead administering the HGN test, it does not show defendant's responses. Nor is Morehead's testimony that defendant admitted at the DMV hearing that he had had "a couple of drinks" corroborated by any other evidence. The jury was denied the opportunity to assess Morehead's credibility as to those facts in light of the evidence that tended to show that he was biased against defendant. As the prosecutor acknowledged in his closing argument at trial, the credibility of the witnesses was of paramount importance to the jury's determination.

The erroneously excluded evidence of Morehead's alleged bias "goes directly to the heart of defendant's factual theory of the case," and "nothing about the context of the legal error here indicates that the jury, in deciding whether the state had carried its burden of proof, would have regarded the excluded evidence as duplicative or unhelpful to its deliberations." *Id.* at 33-34; *compare Najibi*, 150 Or App at 206-08 (affirming a defendant's convictions based on conclusion that erroneously excluded evidence of a witness's potential bias was harmless where two other witnesses, physical evidence, and defendant's admissions corroborated the allegedly biased witness's testimony). Defendant's theory of the case, as expressed in his closing argument, was that Morehead rushed to judgment in concluding that defendant was under the influence. Evidence tending to show Morehead's bias would undoubtedly have strengthened defendant's attack on the accuracy of Morehead's observations. Under those circumstances, we cannot conclude that the trial court's error in excluding evidence tending to show Morehead's bias had

"little likelihood" of affecting the verdict in this case. Put another way, "the jury was not fully informed of matters affecting the credibility of the police officer witness. The lack of information could well have affected the outcome of this trial." *Hubbard*, 297 Or at 802.

Accordingly, we conclude that the trial court's error in excluding evidence of Morehead's alleged bias was not harmless and therefore constitutes reversible error. We reverse and remand for a new DUII trial on that ground.

Reversed and remanded on DUII conviction; otherwise affirmed.