Argued and submitted February 17, affirmed July 20, 2011

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GERALD STANLEY ROBINSON,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR0714095; A141751

260 P3d 671

John Henry Hingson III argued the cause and filed the brief for appellant.

Jamie K. Contreras, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and David B. Thompson, Interim Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

After receiving a citizen's report about a suspected drunk driver, the police located defendant, whose vehicle matched the caller's description, and arrested him. One of the officers, Moyle, drove defendant to jail, escorted him to a small room, and asked him whether he wanted to contact "anyone for advice." Defendant stated that he did, and Moyle gave defendant 20 minutes to contact someone. Defendant attempted to call his attorney during that time but was unsuccessful. Moyle then told defendant that his time was up and asked defendant whether he would submit to a breath test. Defendant, unable to contact his lawyer, refused to submit to the test. He was ultimately charged with driving under the influence of intoxicants (DUII), ORS 813.010, and a jury found him guilty. Defendant now appeals, arguing that the trial court should have suppressed evidence of his refusal to take the breath test and, in any event, should have declared a mistrial when the prosecutor later referred to defendant's statement that he refused to take the test on advice of counsel as an "excuse" for not taking the test. We affirm.

### PRIVATE COMMUNICATION WITH COUNSEL

Before trial, defendant moved to suppress evidence of his refusal to take the breath test on the ground that the police had not provided him with a reasonable opportunity to communicate privately with counsel before deciding whether to submit to the test. *See State v. Durbin*, 335 Or 183, 190, 63 P3d 576 (2003) ("[W]hen an individual has a constitutional right to consult with counsel, that right includes the right to confer privately with counsel."). In his first assignment of error, defendant contends that the trial court erred in denying that motion.

"We state the facts consistently with the trial court's factual findings and its decision denying defendant's motion to suppress." *State v. Shaff*, 343 Or 639, 641, 175 P3d 454 (2007). Officer Moyle arrested defendant for DUII around midnight and transported him to the jail. On the way, Moyle mentioned to defendant that a breath test would be offered at the jail. When they arrived, Moyle completed the booking process and then walked defendant "into the Intoxilyzer room," an eight-foot by eight-foot chamber. At that point,

Moyle asked defendant "if he wanted to call anyone for advice," and defendant responded that he did. Moyle then "pointed to the phone and the phone books, and told him that [Moyle would] be out in the hall, and to please let [him] know when he was done."

Defendant asked Moyle if he was "going to help me." Moyle responded, " 'No,' and that I'd be out in the hall." At 1:10 a.m., Moyle left the Intoxylizer room and closed its door "all but the last few inches"; the door was "either touching or [there was] up to two inches of a gap between the door and the doorframe." Moyle did not shut the door completely because he "know[s] that some people are claustrophobic and being closed in a small room can cause anxiety."

Moyle walked around the corner to do paperwork but returned from time to time to check on defendant. The door to the Intoxilyzer room had a small window that allowed Moyle to see into the room. Moyle "peek[ed] in to see if [defendant] was on the phone, if he was sitting there, make sure that he hadn't, you know, passed out or had any sort of medical problems, * * * because I am responsible for him, just to check on kind of his—his overall progress." During those checks, Moyle "saw [defendant] on the phone attempting to call" but "[a]t no time was [Moyle] able to hear anything that he said, nor [did Moyle] know if he said anything."

At 1:29 a.m., "from outside the Intoxilyzer room," Moyle told defendant "that he needed to finish up on the phone" and that he "had about a minute longer." At 1:30 a.m., Moyle "opened the door and told [defendant] that he needed to be done now." Defendant responded "that he hadn't been able to contact John Henry,[1] and that he wasn't—he wasn't answering and he got a weird message."

At 1:31 a.m., Moyle began the 15-minute observation period that precedes a breath test. He read defendant the implied consent rights, which included asking defendant, "Will you take a breath, blood or urine test? Specifically, will you take a breath test?" Defendant replied that "he couldn't get his attorney." Moyle informed defendant that he "had

---

[1] The parties agree that "John Henry" referred to defendant's attorney, John Henry Hingson III.

given him time to contact someone for advice and that [Moyle] was sorry he had not been able to reach anyone." Defendant told Moyle "that that was right, but he didn't know what to do." At that point, Moyle began the process of obtaining breath samples. He gave defendant directions on how to provide proper samples and where to stand. He then "told him this was his opportunity to give the samples" and that "if he chose not to give the samples, it would be considered a refusal." Defendant explained, "I can't get ahold of my attorney. I'm not saying I won't take the test, but since I can't get ahold of him I don't know what to do." Defendant emphasized that "it was very important that [Moyle] understood that." When Moyle presented the Intoxylizer tube to defendant and asked him to give the sample, defendant "continued to say he wasn't refusing." Defendant "neither grabbed the tube, nor gave the sample," and Moyle informed defendant that he "would be taking his lack of beginning to give samples as a refusal."

Defendant filed a number of pretrial evidentiary motions, including a motion to exclude evidence of his refusal to submit to the breath test. Defendant advanced two arguments in support of that motion. Initially, he argued that the sequence of events was wrong—that, under Oregon law, the request to submit to a breath test must *precede* the opportunity to communicate with counsel, in order to ensure that the decision whether to take the test has the benefit of counsel's advice, whereas Moyle's request to submit to the breath test did not occur until *after* defendant had already been given an opportunity to contact someone. Next, defendant argued that Moyle, by leaving the door ajar, had violated his right to communicate *privately* with counsel. The trial court rejected both arguments and denied defendant's motion.

On appeal, defendant reprises his arguments that Moyle failed to take the proper steps to afford him a reasonable opportunity to consult privately with counsel. Specifically, defendant argues that (1) Moyle failed to request that defendant submit to the breath test before providing him an opportunity to seek counsel; (2) defendant's equivocal invocation of the right to counsel—that is, answering affirmatively to the question whether he wanted to "call *anyone* for advice"—required Moyle to further inquire if defendant

intended to contact *counsel* and, if so, to inform defendant that the conversation would be private; and (3) no reasonable person in defendant's position would have understood his communications with counsel to be private with the door left ajar. We are not persuaded by those contentions; in short, defendant overstates the right to counsel under Article I, section 11, of the Oregon Constitution in this context.

A driver arrested for DUII has a "right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." *State v. Spencer*, 305 Or 59, 74-75, 750 P2d 147 (1988). The driver need not specifically request privacy to consult with counsel; rather, "[t]he request for counsel, by itself, indicates that the arrested driver wants the essential elements that inhere in that right, including the opportunity for confidential communication." *Durbin*, 335 Or at 191. There is no right, however, to actually contact an attorney. In other words, a defendant "has only the right to a reasonable opportunity to do so." *State v. Roesler*, 235 Or App 547, 551, 234 P3d 1004 (2010).

Neither this court nor the Oregon Supreme Court has ever endorsed a particular script or timeline that officers must follow in order to afford an arrested driver a reasonable opportunity to obtain advice of counsel before submitting to a breath test. In *Durbin*, the court explained,

> "To obtain evidence of an arrested driver's blood alcohol level without violating the driver's right to counsel, *police might find it preferable* to inform the driver of their intent to administer the breath test and then, if the driver requests counsel, to allow the driver a reasonable time in which to seek legal advice, in private, before beginning the required observation period."

335 Or at 194 (emphasis added). That, however, is a far cry from imposing on police the requirement that defendant urges—namely, that an actual request for the breath sample precede any opportunity to consult with counsel.

The touchstone in this circumstance is whether a DUII suspect has been provided a "reasonable opportunity" to obtain counsel before submitting to the breath test; the inquiry is not susceptible to a bright-line test demanding a particular sequence of events. Here, there is no question that,

before asking defendant whether he wanted to call anyone for advice, Moyle had communicated his intent to administer a breath test. Moyle informed defendant on the way to the jail that such a test would be offered. Once at the jail, Moyle took defendant to a room in which he was seated next to an Intoxylizer machine, at which point Moyle asked him whether he wanted to "call anyone for advice." After later being asked whether he would submit to a breath test, defendant replied that "he couldn't get his attorney." In other words, Moyle communicated—and defendant understood—that the opportunity provided was for the purpose of obtaining advice about whether to take the breath test; there is no requirement in Oregon law that an officer formally request the sample before providing an opportunity for a suspect to seek advice about whether to provide such a sample, so long as the suspect, when he or she has that opportunity, knows or should know that a breath test is imminent.

Nor do we agree with defendant that, in all cases, an equivocal invocation of the right to counsel—such as answering affirmatively to Moyle's question whether he wanted to "call anyone for advice"—necessarily triggers a duty on the officer's part to further inquire about a suspect's intentions, although that contention merits further discussion in light of certain language in our previous cases.

Defendant argues:

"Officer Moyle asked the defendant if he wanted to 'call anyone for advice.' Defendant responded that he did. That was sufficient to constitute 'an equivocal invocation of the right to counsel' triggering duties to be performed by Officer Moyle. Officer Moyle failed in his duty to ask the defendant follow up questions to determine whether defendant was going to try to contact an attorney. The police *'must'* ask follow-up questions to determine whether they must inform the person that once an attorney is contacted, privacy of communication will be afforded."

(Footnote omitted; emphasis in original.) Defendant premises his argument on a paragraph in *State v. Ohm*, 224 Or App 390, 395-96, 197 P3d 1136 (2008), in which we explained:

"The question in this case, therefore, is whether defendant invoked her right to counsel when she told the police

officer that she 'wanted to ask someone' for advice before deciding whether to take the breath test. If a suspect makes an equivocal invocation of the right to counsel under Article I, section 12[, of the Oregon Constitution], police are required to ask follow-up questions to determine what the suspect meant before proceeding with interrogation. *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996). Similarly, *we conclude that, if a driver arrested for DUII makes an equivocal invocation of the right to counsel under Article I, section 11, police must ask follow-up questions to determine whether they must inform the driver that, once he or she contacts an attorney, privacy will be afforded*. In determining whether a defendant's statement is an equivocal invocation, we view the statement in light of the totality of the circumstances at and preceding the time that it was made 'to ascertain whether a reasonable officer in the circumstances would have understood that defendant was invoking [her] rights.' *State v. Holcomb*, 213 Or App 168, 176, 159 P3d 1271, *rev den*, 343 Or 224 (2007)."

(Footnote omitted; emphasis added.)

Viewed in isolation, the emphasized sentence in *Ohm* could be read to support defendant's position. Our holding in that case, however, must be viewed in the context of its facts ("[t]he question in *this case * * *")—and one fact in particular: The officer never left the suspect alone. In that context, where a suspect has made an equivocal request for counsel *and it appears that the officer intends to remain in the room with the suspect*, it is imperative that the officer inquire further. That is so for two reasons. First, the right to private communication is only accorded if the suspect has invoked the right to *counsel*, *Ohm*, 224 Or App at 395 ("[A] driver arrested for DUII has the right, upon request, to consult with a lawyer or a nonlawyer, but to consult *privately* only with *counsel*." (Emphasis in original.)), so it is necessary for the officer to determine whether the suspect has, in fact, invoked that right. Second, if the right to counsel has been invoked, the officer's continued presence has a potential chilling effect on that right. As we explained in *State v. Matviyenko*, 212 Or App 125, 130, 157 P3d 268 (2007),

"[W]hen a DUII arrestee has asked to call an attorney, *if an officer intends to remain seated in the room until the call is made*, we think that the onus is properly on the officer to

inform the arrestee—before the call is made—that, once he or she contacts an attorney, privacy will be afforded. *That is because a person in circumstances such as these could reasonably conclude that, if an officer says that the person may make his or her phone calls and then sits down at the desk, the officer is planning to remain for the duration of the calls."*

(Emphasis added.) *See also State v. Tyon,* 226 Or App 428, 439, 204 P3d 106 (2009) ("[T]he constitutional problem in *Durbin* was that the officer stayed in the room, within earshot, during the actual conversation between the defendant and his attorney.").

If, however, an officer leaves the room once a suspect makes an equivocal request for counsel—thereby affording the suspect the opportunity to communicate privately with anyone, lawyer or nonlawyer—the relevant concerns in *Ohm* are not present. That is, the obligations on officers to inquire in the context of an equivocal request for counsel and to inform a suspect that privacy will be provided are not distinct from, or in addition to, the suspect's right to a reasonable opportunity to consult privately with counsel. Rather, they are means of ensuring that such an opportunity has been provided when the circumstances—such as the presence of the officer in the room—would otherwise chill the exercise of the right to counsel.

Indeed, that is the approach this court has since taken, albeit without specifically addressing *Ohm.* In *Tyon,* the defendant, after being arrested for DUII, was placed in a holding cell and told that he could contact an attorney. During a 45-minute period, the officer who had arrested the defendant (Morehead) and the jail staff remained near the holding cell, in an adjacent room and another room connected to the adjacent room. The door between the holding cell and adjacent room was closed, "but there was an open cuff port (slot) in the door." 226 Or App at 433. A recording from the jail demonstrated that "throughout the entire period, [the] defendant, Morehead, and the jail staff were able to hear one another through the door slot." *Id.* Neither Morehead nor the jail staff ever informed the defendant that "they would give him privacy once he reached his attorney by closing the cuff port or moving out of earshot of [the] defendant." *Id.*

On appeal, the defendant in *Tyon*, relying on the Supreme Court's decision in *Durbin*, argued that "the fact that Morehead and the jail staff remained within earshot while he attempted to contact his attorney and never told [the] defendant that he would be given privacy once he reached an attorney violated his right to a private consultation with an attorney." *Id.* at 439. We rejected that argument, explaining that the "constitutional problem in *Durbin* was that the officer stayed in the room, within earshot, during the actual conversation between the defendant and his attorney." *Id.* The facts in *Tyon* were distinguishable from *Durbin*, we held,

> "because the defendant in [*Durbin*] actually contacted his attorney and, at that point, the officer declined to give the defendant privacy in consulting with his attorney. *Under those circumstances, we presume that there was a chilling effect and thus do not require the defendant to prove that there was.* However, where, as in this case and in *Matviyenko*, the defendant never actually contacts an attorney, the potential chilling problem pertains to the defendant's decision whether to continue trying to make the call."

*Id.* at 439-40 (emphasis added). We then held that, despite the fact that there was an open slot in the door and an officer within earshot, the defendant's right to consult privately with counsel had not been violated:

> "That concern is not present in this case, because the record demonstrates that defendant was not deterred from trying to call his attorney. His efforts to do so continued unabated until Morehead intervened by calling 'Time.' The officers' failure to inform defendant that he would have been afforded privacy had he actually contacted his attorney did not have the chilling effect that we identified in *Matviyenko*. We do not have to speculate as to the effect of Morehead's and the jail staff's presence within earshot of defendant because we know that it did not have any effect—defendant never stopped trying to reach his attorney during the attorney consultation period. Thus, defendant's right to consult privately with an attorney was not violated."

*Id.* at 440.

*Tyon* essentially disposes of defendant's arguments. Here, too, defendant never actually contacted counsel, so

there could be no chilling effect on the content of an attorney-client conversation. Nor did anything chill defendant's *attempt* to contact an attorney.

On that point, defendant argues that his efforts to call an attorney were impeded by the fact that the Intoxilyzer door was left slightly ajar—"up to two inches." According to defendant, "[t]he effect of Officer Moyle leaving the door to the Intoxylizer room ajar was the functional equivalent of the officer staying in the room, as in *Matviyenko*."

Setting aside the obvious differences between an officer present in the room and a door slightly ajar, there is no basis on this record to conclude that the cracked door had any effect on defendant's efforts to contact counsel. The reason that defendant was unable to contact counsel was that his attorney "wasn't answering and he got a weird message"; that had nothing to do with the fact that the door was cracked two inches. Defendant was given a reasonable opportunity to contact an attorney but was unable to do so, through no fault of the police. Defendant's right to consult privately with an attorney extends no farther than that, and the trial court did not err in denying his motion to suppress evidence of his refusal to submit to a breath test.

## THE "HOBSON'S CHOICE" TO TESTIFY

Defendant also moved *in limine* to exclude any reference to his refusal based on another theory: that it forced him into an unfair choice. According to defendant, he only refused to submit to the test because he wanted first to talk with his lawyer—that is, he was asserting his constitutional right to counsel. Thus, he argued, evidence of his refusal forced him into a "Hobson's choice": Either leave the refusal unexplained before the jury, thereby creating the impression that he feared that the outcome of the test would reveal intoxication, or waive his right to exclude evidence of his invocation of the right to counsel. The trial court denied the motion.

The case was then tried to a jury, and, as defendant anticipated, the state offered evidence of his refusal to take the breath test. Defendant chose the latter option of his Hobson's choice, endeavoring to explain why he did not take

the test. He elicited testimony from Moyle on cross-examination regarding the circumstances of the refusal, which included defendant's statement to Moyle that, "I'm not saying I won't take the test. Since I can't get ahold of [my attorney], I don't know what to do."

The prosecutor, during closing argument, addressed that very testimony. She argued,

> "Let's talk just a little bit more about that. The defendant said that he wasn't saying he wouldn't take the test, but he wanted to speak to an attorney. *And I would submit to you, ladies and gentlemen, that that's an excuse.*"

Defendant immediately objected and asked for a mistrial, arguing that the prosecutor was "demeaning" the exercise of the right to counsel by describing it as an "excuse." The prosecutor responded that "the defense opened the door to this and brought this evidence in and I believe it's now properly arguable * * *." The court overruled defendant's objection and denied the motion for a mistrial. However, the court instructed the jury that "[e]vidence that the defendant requested the advice of a lawyer has been admitted for a limited purpose. You may not consider defendant's request for a lawyer as evidence that the defendant is guilty."

On appeal, defendant offers a combined argument as to why the court erred (1) by denying the motion *in limine* and (2) by refusing to declare a mistrial. Both arguments are premised on the theory, set out above, that the admission of the breath test refusal put defendant in an impossible position whereby he was forced to waive his privilege to exclude otherwise inadmissible evidence regarding his invocation of the right to counsel. For that reason, he argues, the prejudice resulting from the admission of his refusal substantially outweighed its probative value and, coupled with the prosecutor's comments, denied him a fair trial.

We have previously rejected the proposition that the right to counsel is violated *per se* when the admission of a breath test creates this type of dilemma for a defendant. In *State v. Anderson*, 53 Or App 246, 251, 631 P2d 822 (1981), the defendant argued that, "if evidence of the fact of his refusal is admissible at trial, 'the only way a defendant can

rebut the inference that he has refused the test because he believed he would fail the test, is to reveal his conversations with his attorney.' " Additionally, the defendant argued that "to corroborate his own testimony concerning his conversation with his attorney, he will be forced to call his attorney as a witness." *Id.* We held:

> "There may be many reasons, besides consciousness of guilt, for a person to refuse to take a test. Advice of counsel is one reason. Once the fact of defendant's refusal is admitted into evidence, he must make the choice to explain it or not. While he may feel some compulsion to explain his behavior, he is not forced to reveal any conversation with counsel or to have his attorney take the stand. It is simply a matter of choice, and we do not agree that it violates defendant's constitutional right to counsel or interferes with the attorney-client privilege."

*Id.* at 251-52.

*Anderson* also involved an OEC 403 argument similar to that advanced by defendant: that the probative value of the evidence of his refusal was substantially outweighed by its prejudicial effect.[2] The trial court had not addressed that argument, so we remanded for the court to do so in the first instance. We noted, however, our view that "it will be a rare case indeed in which [a] defendant is entitled to have this evidence kept from the trier of fact. The legislature has declared this evidence to be relevant; trial courts should not ignore the legislative policy." *Id.* at 252-53.

Against that backdrop, defendant argues that this is indeed the "rare case" envisioned in *Anderson*, in which the probative value of the evidence is substantially outweighed by its prejudicial effect. We are not persuaded. This court will not reverse a trial court's ruling under the OEC 403 balancing test unless the trial court has abused its discretion. *State v. Williams*, 313 Or 19, 29-30, 828 P2d 1006, *cert den*, 506 US

---

[2] OEC 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

858 (1992). Defendant's refusal was a key piece of the evidence against him. Meanwhile, the prejudice that he identifies—the risk that the jury might draw some inference of consciousness of guilt from his request for counsel—could be mitigated with a jury instruction like the one given in this case: "You may not consider defendant's request for a lawyer as evidence that the defendant is guilty." *See State v. Barone*, 329 Or 210, 236, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2001) (probative value of evidence was not "substantially outweighed" by prejudice where "any prejudicial effect of the testimony was blunted by the trial court's limiting instruction. The court clearly instructed the jury to consider the evidence only for the specific purposes for which it was admitted."). Under the circumstances, the court did not abuse its discretion by denying defendant's motion to exclude evidence of his refusal to submit to the breath test.

Our conclusion in that regard effectively resolves defendant's remaining assignment of error regarding his motion for a mistrial. Once the evidence of his refusal was properly admitted, and once *defendant* elicited testimony suggesting that he had refused only because he could not obtain counsel, the door was open for the prosecutor to comment on defendant's reasons for refusing the test. *See State v. Clark*, 233 Or App 553, 559, 226 P3d 120 (2010) (prosecutor's comments in closing argument on the defendant's exercise of the right to remain silent were not grounds for a mistrial where defense counsel during cross-examination "opened the door to the prosecutor's comment"); *State v. Guritz*, 134 Or App 262, 270, 894 P2d 1235, *rev den*, 321 Or 560 (1995) ("The prosecutor has the right * * * to reply to argument made by opposing counsel, and, in doing so, statements may be made which otherwise would be improper. * * * Defense counsel effectively precipitated the prosecutor's remarks, and, under the circumstances, [the] defendant now should not be heard to complain of the consequences."). Thus, the court did not err in denying defendant's motion for a mistrial.

Affirmed.