Submitted April 30, 2014, reversed and remanded August 12, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

GARY RONALD MILLER,
aka Gary Edwin Miller,
*Defendant-Appellant.*

Klamath County Circuit Court
1100638CR; A151158

358 P3d 301

Peter Gartlan, Chief Defender, and Jonah Morningstar, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Sarah M. Villanueva, Assistant Attorney General, filed the brief for respondent.

Before Duncan, Presiding Judge, and Haselton, Chief Judge.

DUNCAN, P. J.

### DUNCAN, P. J.

During his criminal trial on charges of assault in the fourth degree constituting domestic violence, ORS 163.160, and harassment, ORS 166.065(1)(a)(A), defendant sought to introduce evidence that the complaining witness was biased against him. Specifically, he sought to introduce evidence that the complaining witness had physically attacked him a few weeks before she made the allegations on which the charges against him were based. Defendant argued that the evidence was admissible under OEC 609-1, which provides, in part, that "[t]he credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest." The trial court excluded the evidence, stating that it was not evidence of bias. A jury acquitted defendant of the assault count, but convicted him of the harassment count.

Defendant appeals, assigning error to the trial court's exclusion of his proffered bias evidence.[1] The state does not dispute that the trial court erred by excluding the evidence; the state's only argument on appeal is that, if the trial court erred by excluding the evidence, the error was harmless. For the reasons explained below, we conclude that the trial court erred by excluding the evidence and that the error was not harmless. Therefore, we reverse and remand.

We begin with the undisputed evidence. On January 12, 2011, the date of the alleged crimes, defendant was married to and living with the complaining witness, C, in Klamath County. Defendant and C had a young son, and C had two young daughters from a prior relationship. All three children lived with defendant and C.

On January 12, defendant and C had an argument because defendant had had an extramarital affair. As detailed below, the charges were based on the argument, and, at trial, defendant and C gave different accounts of the argument.

---

[1] Defendant also assigns error to the trial court's entry of a judgment of conviction based on a six-person jury verdict. We reject that assignment without discussion because defendant's argument in support of it is the same as the argument that the Supreme Court rejected in *State v. Sagdal*, 356 Or 639, 343 P3d 226 (2015), which was decided after defendant filed his brief in this case.

On January 21, C learned that she had a sexually transmitted disease (STD). C believed that defendant had transmitted the disease to her after acquiring it from the woman with whom he had had the affair. C moved out of the couple's house. The next day, January 22, C went to a hospital and was diagnosed with a nasal fracture.

Around January 25, defendant filed a restraining order against C, and she filed one against him a few days later. On the morning of January 31, defendant and C appeared in Klamath County Circuit Court for a hearing on the restraining orders and related child custody matters, and defendant served C with a divorce petition. The hearing was postponed until the afternoon, and, during the postponement, C, who had been staying with family in Portland, went to the Klamath County Sheriff's Office to make a report about the January 12 incident.

Based on C's report, the state charged defendant with fourth-degree assault and harassment. Count 1, the assault count, alleges that defendant "did unlawfully and recklessly cause physical injury to [C], and *** that this was an act of domestic violence[.]" Count 2, the harassment count, alleges that defendant "did unlawfully and intentionally harass or annoy [C] by subjecting [C] to offensive physical contact[.]"

As mentioned, at trial, defendant and C gave different accounts of the January 12 incident. Because the issues on appeal are whether the trial court erred in excluding defendant's proffered bias evidence and, if so, whether the error was harmless, the parties' competing theories and evidence are relevant to our analysis. Therefore, we describe them in some detail.

Defendant testified that, on January 12, he and C were arguing about his affair and that, as he was sitting at a computer in their bedroom, she was pushing his chair in order to provoke him. He told her that, if she did not stop, he would call the police, and he stood up and dialed 9-1-1 on his cell phone. According to defendant, C started to push him in the chest, hit him in the head, and shove him into the wall. Defendant dropped his phone, grabbed C's wrists, and held her down on the bed to keep her from hitting him. C flailed

and kicked, and defendant and C rolled off the bed and onto the floor, where defendant continued to hold C's arms. Defendant testified that he called for C's oldest daughter, who came into the room, at which point he got off of C and then took the children to his father's house.

Defendant testified that a police officer, Weber, came to their house in response to the 9-1-1 call, and he told Weber everything was fine. Defendant testified that he left the couple's house to go to work around the same time Weber left, and he and C did not have any physical altercations after that.

In contrast, C testified that, on January 12, she and defendant had three physical altercations. She denied being the aggressor and said that defendant had injured her.

Regarding the first physical altercation, C testified that, while she and defendant were fighting about defendant's affair, defendant pushed her down on their bed, pinned her arms above her head, and punched her in the face. C believed that defendant pinned her arms down so that she would not be able to block his punch. C testified that, as a result of the punch, she suffered a bloody nose and swollen lip.

According to C, sometime after the first physical altercation, there was a second physical altercation, during which defendant held her down on the floor next to their bed, straddling her and pinning her arms. C testified that, after the second physical altercation, Weber came to the couple's house. C told Weber that she was fine, and she attempted to hide her swollen lip from him. At trial, C explained that she told Weber that she was fine because defendant was standing next to her at the time. Weber was at the house for approximately 20 minutes.

According to C, after Weber left, there was a third physical altercation, during which defendant came toward her and she put her arms out to block him. They both fell onto their bed and then onto the floor, where defendant again straddled her and held down her arms. C testified that she called for her oldest daughter, who came into the couple's bedroom. According to C, defendant told the daughter that

he had had to restrain C because she was out of control. Defendant got off of C and took the children next door to his father's house.

Weber was called as a witness by the state, and he testified that he was dispatched to the couple's house in response to a "9-1-1 hang up" call. At the house, Weber spoke to defendant, who said that he and C had had a verbal altercation, but that nothing physical had happened. Weber asked defendant to "stand away from me so I could keep an eye on him and talk with [C]." C confirmed that she and defendant had had a verbal altercation and that nothing physical had happened. Weber did not see any physical injuries on defendant or C. He stood "two or three, four or five feet" from C and was able to see her whole face. Weber left the couple's house without making an arrest or issuing a citation. He testified that, as he left, so did defendant.

Throughout the trial, defense counsel argued that C had fabricated her allegations about the January 12 incident because she was extremely angry with defendant about his affair and its consequences and because she wanted to gain an advantage in their child custody proceedings. Defense counsel pointed out that C did not seek a medical treatment for her nose until January 22, which was after she learned she had an STD. He also pointed out that she did not make her report to the sheriff's office until January 31, which was after defendant had filed for a restraining order, custody of their son, and divorce. In addition, defense counsel argued that, by the time of trial, C had additional reasons to proceed with her allegations, including that she and defendant were involved in a custody dispute over their daughter, who was born after they separated, and that defendant had fathered a child with the woman with whom he had had the affair.

To support his argument that C fabricated the allegations against defendant because she was extremely angry at him, defense counsel attempted, during his cross-examination of C, to introduce evidence that, a few days before January 12, C had physically attacked defendant in their front yard, in the presence of defendant's friend, Johnston. Defense counsel proffered a variety of theories of

admissibility, each of which the trial court rejected. As an offer of proof, defense counsel cross-examined C outside the presence of the jury. C testified that, when Johnston arrived, she went outside to confront him about defendant's affair and, when she did, defendant covered her mouth with his hands and she pushed him off. C did not admit to physically attacking defendant.

When trial resumed the following day, defense counsel again attempted to introduce evidence that C had physically attacked defendant in their front yard in Johnston's presence. He argued that (1) the evidence was admissible under OEC 609-1 to show that C was biased against him, and (2) that admission of the evidence was required to give effect to his rights, under the state and federal constitutions, to confront the witnesses against him. The court ruled that defendant's proffered evidence was "not bias" evidence.

Defense counsel called both defendant and Johnston as witnesses to make an offer of proof, and each of them testified that, when Johnston came to visit defendant a few days before January 12, defendant was in the front yard and C came out of the house, demanding to know why Johnston was there, and, when defendant told her to be quiet, she punched him several times, until he pushed her back and walked away.

After the offer of proof, the trial court asked defense counsel why the proffered evidence was important, and defense counsel explained:

> "Because [C], a couple of days before the incident alleged, was angry enough at [defendant] to be hitting him closed fist, out in the open, in front of another witness. If she was angry enough to hit him, she was probably angry enough to lie about other things that have happened as well. It is absolutely bias. I mean, hitting someone would be pretty clear evidence of a bias against them. Given the [proximity] to the incident day, I think this is absolutely relevant to show her bias."

The trial court adhered to its ruling that the proffered evidence was not admissible as bias evidence and excluded the evidence.

In her closing argument, the prosecutor argued that the jurors should convict defendant of the assault count for injuring C's nose and that they should convict him of the harassment count for his conduct during either the second or third physical altercations that C described. Regarding the harassment count, the prosecutor specifically argued that "[a]ny conduct within * * * either of those two incidents that you think would harass a reasonable person * * * [t]hat constitutes harassment."

The prosecutor urged the jury to reject defendant's theory that C had fabricated her allegations against him because she was angry with defendant and because she wanted to improve her position in their child custody dispute. The prosecutor specifically argued that some of the evidence on which defendant was relying to show that C was angry with him was irrelevant because it occurred after C made her report on January 31, stating that "the only thing that matters" regarding the parties' relationship and whether C was angry with defendant "is what happened up to the 31st." Thus, the prosecutor argued, the couple's custody disputes were irrelevant to the jury's assessment of C's credibility because "[C's] report to the police officer was done by the time any of the custody hearing[s] started."

The jury found defendant not guilty of the assault count, but guilty of the harassment count. This appeal followed.

On appeal, defendant argues that the trial court erred by excluding his proffered bias evidence, renewing both his argument that the evidence was admissible under OEC 609-1 and his argument that the trial court's exclusion of his proffered bias evidence violated his rights under Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution, to confront the witnesses against him. As mentioned, the state does not dispute that the evidence was admissible; its only argument on appeal is that, if the trial court erred by excluding the evidence, the error was harmless.

We begin our analysis by addressing defendant's OEC 609-1 argument. Whether evidence is admissible under

OEC 609-1 is a question of law, which we review for errors of law. *State v. Tyon*, 226 Or App 428, 440, 204 P3d 106 (2009) ("We review for errors of law a trial court's decision to exclude evidence that establishes sufficient facts from which bias or interest of a witness may be inferred.")

OEC 609-1 provides:

"(1)   The credibility of a witness may be attacked by evidence that the witness engaged in conduct or made statements showing bias or interest. * * *

"(2)   If a witness fully admits the facts claimed to show the bias or interest of the witness, additional evidence of that bias or interest shall not be admitted. If the witness denies or does not fully admit the facts claimed to show bias or interest, the party attacking the credibility of the witness may then offer evidence to prove those facts."

Thus, under OEC 609-1, a party may cross-examine a witness about acts from which it could be inferred that the witness is biased against the party. If the witness does not admit the acts, then the party may introduce additional evidence of bias.

Evidence of a witness's bias is admissible as impeachment evidence because it is relevant to the witness's credibility. *State v. Nguyen*, 222 Or App 55, 60, 191 P3d 767 (2008), *rev den*, 345 Or 690 (2009) ("It is always permissible to show the interest or bias of an adverse witness because the evidence of a witness's bias or interest goes to the witness's credibility."). Bias evidence is relevant under OEC 609-1 if it has "a mere tendency to show bias or interest of the witness." *State v. Hubbard*, 297 Or 789, 796, 688 P2d 1311 (1984). "Bias may be evidenced by * * * prior fights or quarrels[.]" Laird C. Kirkpatrick, *Oregon Evidence* § 609-1.03[2], 548 (6th ed 2013); *see also State v. Prange*, 247 Or App 254, 262, 268 P3d 749 (2011) (evidence of hostility between victim's family and defendant's family was relevant to whether victim's account of alleged crimes was credible).

Here, defendant's proffered evidence that C had physically attacked him a few days before the alleged crimes was relevant to whether C was biased against defendant and, therefore, was relevant to whether C's account of the

alleged crimes was credible; as such, it was admissible as impeachment evidence under OEC 609-1. Thus, the trial court erred by denying defendant the opportunity to cross-examine C about the incident in the couple's front yard and, because C denied assaulting defendant during that incident, the trial court erred by denying defendant the opportunity to testify, and have Johnston testify, about the incident.

Because we conclude that the trial court erred in ruling that defendant's proffered bias evidence was not admissible under OEC 609-1, we do not address defendant's argument that the trial court's exclusion of the evidence violated his constitutional rights under the state and federal confrontation clauses. Instead, we turn to the question of whether the error was harmless.

An evidentiary error is harmless if there is "little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). "[A] decision to exclude evidence relevant to bias or interest * * * is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." *Hubbard*, 297 Or at 800.

The state argues that, if the trial court erred by excluding defendant's proffered bias evidence, the error was harmless for two reasons, which we address in turn.

The state's first argument is that the trial court's exclusion of defendant's proffered bias evidence was harmless because defendant essentially admitted the only crime for which the jury convicted him. The state argues:

> "The jury found the defendant not guilty of the assault charge, clearly indicating that it had discredited [C's] account enough to find a reasonable doubt. * * * Further discrediting [C's] account would not have affected the harassment charge because defendant and the victim's version of that part of the story aligned. Specifically, defendant himself testified that he restrained [C] on the bed by pinning her down by her wrists. Accordingly, any further evidence of [C's] bias toward defendant would not have affected the verdict. The jury convicted defendant of the only offense that he, essentially, admitted to doing."

The state's argument fails because, contrary to the state's assertion, defendant did not admit the crime of harassment. First, defendant did not admit the conduct on which the harassment count was based. As described, the prosecutor told the jury that it could convict defendant of harassment based on his conduct during either the second or the third physical altercation that C described, but defendant did not admit that those altercations even occurred; he testified that he and C had only one physical altercation. Second, the conduct that defendant did admit does not constitute harassment. Although defendant admitted holding C down and pinning her arms over her head, he did not admit, as required for the crime of harassment, that he acted with the intent to annoy or harass her. *See State v. Sallinger*, 11 Or App 592, 595, 504 P2d 1383 (1972) (to prove the crime of harassment, the state must prove that the defendant had the specific intent to harass or annoy). To the contrary, he testified that he held C's arms to keep her from hitting him.

The state's second argument is that the trial court's exclusion of defendant's proffered bias evidence was harmless because the evidence was cumulative. The state argues that "there was already ample evidence in the record that C was biased against defendant." Specifically, the state points out that there was evidence that defendant had had an affair, given C a sexually transmitted disease, filed for a restraining order, divorce, and child custody against C, and fathered a child with the woman with whom he had had the affair.

The state's argument is unavailing. Although the trial court admitted other evidence that C was biased against defendant, the excluded evidence was not cumulative; it was qualitatively different from the admitted evidence. First, the excluded evidence related to whether C was biased against defendant *before* she made her January 31 report, whereas some of the evidence on which the state now relies related to events that occurred *after* C made her January 31 report, which the prosecutor argued were irrelevant to the jury's assessment of C's credibility. Second, the admitted evidence was evidence that C *had reason to be* angry with defendant, whereas the excluded evidence was evidence that C *actually was* angry with defendant and that

she was so angry with him that she physically attacked him in their front yard, in front of a witness. In other words, the excluded evidence showed the existence and extent of C's hostility toward defendant. *See Prange*, 247 Or App at 265 (exclusion of evidence of hostilities between defendant's family and the complaining witness's family was not harmless, in part, because the evidence included a description of "a specific incident and a level of animosity"). Without it, the jury did not have an adequate opportunity to assess C's credibility. As a result, we must reverse and remand for a new trial.

Reversed and remanded.