Argued and submitted January 26, affirmed April 19, petition for review denied August 3, 2023 (371 Or 309)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATHAEL MALACHI ROBINTREE,
*Defendant-Appellant.*

Linn County Circuit Court
19CR50573; A175863

528 P3d 1207

Defendant appeals a judgment of conviction for one count of first-degree sexual abuse, ORS 163.427. On appeal, he contends that the trial court erred in prohibiting defendant from cross-examining the victim about her pending juvenile adjudications for the purpose of establishing bias. *Held*: The Court of Appeals concluded that the trial court erred in prohibiting defendant from cross-examining the victim about her pending juvenile adjudications for the purpose of establishing bias. The court further concluded that, in view of the evidence in the record and the parties' strategies at trial, including defendant's strategy of acknowledging that he had inappropriate contact with the victim, any error was harmless. Consequently, the court affirmed.

Affirmed.

Brendan J. Kane, Judge.

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Benjamin Gutman, Solicitor General, argued the cause for respondent. Also on the brief was Ellen F. Rosenblum, Attorney General.

Before Tookey, Presiding Judge, and Egan, Judge, and Kamins, Judge.

EGAN, J.

Affirmed.

**EGAN, J.**

Defendant appeals a judgment of conviction for one count of first-degree sexual abuse, ORS 163.427. On appeal, he contends that the trial court erred "in prohibiting defendant from cross-examining [the victim, M,] about her pending juvenile adjudications for the purpose of establishing bias." The state concedes that the trial court erred but contends that the error was harmless. As explained below, we accept the state's concession. Further, in view of the trial record as a whole, we agree with the state that the error was harmless. Consequently, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

Regarding the alleged evidentiary error, "we describe the challenged evidence in context." *State v. Deshaw*, 309 Or App 535, 536, 483 P3d 34 (2021). As to the harmlessness of any error, "we look to the trial record as a whole." *Id*. Because it is essential to our conclusion that the evidentiary error in this case was harmless, we provide a detailed overview of the background facts, the evidence presented at trial, and the parties' theories of the case.

A.  *Background and the Evidence at Trial*

In the summer of 2019, M was 12 years old, and M's mother had been in a three-year intimate relationship with defendant. M lived with her brother, her mother, and defendant. M's mother had asked M not to sleep on the couch in the living room of their apartment, but at around 5:00 a.m. one morning, she was sleeping on that couch. There is no dispute that M awoke to defendant touching her inappropriately on or near her buttocks.

According to M's trial testimony, the events transpired as follows: She was sleeping on her family's couch, where she was not supposed to sleep, and she woke up with defendant's hand "in my pants," "inside my clothes," towards her "butt" and "closer to my thigh" and vagina. She got up and went to her room. Defendant later told M, with regard to the touching, that he was "sorry" and "ashamed" for what he did.

Defendant did not cross-examine M regarding the details of the inappropriate contact during his trial. During

cross-examination, M testified that she, her mother, and her brother, would tickle each other sometimes. M also testified that there were occasions when defendant was living with her when defendant tried to tickle her, which made her feel uncomfortable. Additionally, defendant elicited testimony from M's mother that there was an incident before the conduct that led to the charges in this case where M was "running around the house, and [defendant] kept, like, smacking her butt." M told her mother that M was "uncomfortable with that," and, according to M's mother, "that activity stopped."

Over the next month, M disclosed the incident when defendant inappropriately touched her while she was sleeping on the couch to several individuals, including her mother and older brother. One of those individuals—the mother of one of M's friends—testified at defendant's trial that shortly after the inappropriate contact was disclosed to her, but prior to the police being notified, M told her that she was "scared to go home" because she was worried that she would "be touched" by defendant. M's mother confronted defendant about the touching.[1]

As a result of M's disclosures, M's older brother contacted another family member who contacted the police, and the police began investigating defendant's conduct.[2]

During the police investigation of defendant's conduct, M participated in two interviews with law enforcement that were recorded on video. Those recordings were admitted as substantive evidence of defendant's conduct during defendant's trial under OEC 803(18a)(b), which provides a hearsay exception for statements concerning acts of abuse when the declarant testifies and is subject to cross-examination.

---

[1] During defendant's trial, M's mother testified, among other points, that on or about July 29, 2019, M disclosed that defendant "touched me on the couch when I was sleeping," that the touching was "kind of the buttocks, private area," that it was "inside of her underwear," and that defendant had made various admissions to the mother, including that he was sexually attracted to M. Defendant argued that M's mother was not a credible witness because she was worried about involvement by the Department of Human Services based on her failure to report the sexual abuse to police and that the police had "implanted in her mind" ideas about what defendant and M had said to her.

[2] There was conflicting information at trial concerning who contacted the police. M testified that she believed it was her older brother who contacted the police.

The first recording was made on July 31, 2019—the day police initially made contact with M. It was made by Albany Police Officer Bell, who went to M's apartment because of a report of "some sort of physical abuse or sex abuse." Bell made contact with M, and her interactions with M were recorded on Bell's body camera. M told Bell that she believed that Bell was at the apartment because defendant had "violated her" and explained that defendant had "touched her inappropriately." When asked for specifics, M explained to Bell that she was sleeping on the couch face down and defendant touched her under her underwear "right in the middle of my butt and my vagina." When asked whether defendant was doing anything with his hand, M replied that he was "just holding it there," and that defendant did not put "anything inside of [her]." M explained that she moved away from defendant. M also told Bell that she had told defendant not to touch her and stated, "you can't do that," and that defendant had said, "Hi [M]" and "you shouldn't be on the couch." M told Bell that defendant had later apologized to her and told her that he was "ashamed" of himself.

The second video was recorded on August 21, 2019, during a forensic interview of M by Albany Police Detective Lovejoy. During the forensic interview, M told Lovejoy that she was sleeping on the couch "face down" and woke up to defendant "having his hand in my pants" on "my butt" by the "[i]nner thigh." M said that defendant's hand was not "doing anything" or "moving at all." Later in the video, M noted that defendant apologized to her for his conduct and said that "it would never happen again."[3]

As a result of the police investigation, defendant was arrested and charged with first-degree sexual abuse, ORS 163.427. A person commits first-degree sexual abuse if they "subject[] another person to sexual contact and *** [t]he victim is less than 14 years of age." Sexual contact is defined in ORS 163.305(5) as "any touching of the sexual or other intimate parts of a person or causing such person to

---

[3] We note that there were some minor potential discrepancies in M's recorded statements: For example, during one of the recorded statements, M described herself as wearing shorts when defendant touched her, and in the other statement she described herself as wearing pants.

touch the sexual or other intimate parts of the actor for the purpose of arousing or gratifying the sexual desire of either party."

During defendant's incarceration, but before his trial, he called M's mother from the jail. A recording of that call was admitted during defendant's trial. On that recording, defendant acknowledged that he had made "bad choices." Defendant also wrote M's mother a letter, which was also admitted into evidence, in which he stated that he was sorry and that he had "failed her."

After defendant's release from jail, but prior to his trial, he lived with his stepfather and the stepfather's wife for about two weeks. At defendant's trial, the stepfather's wife testified that, while defendant was living with them, with regard to the criminal charges against him, defendant said that "he did it and he was guilty." Defendant's step-father testified that he asked defendant why he engaged in the alleged misconduct and what he was thinking, and defendant replied that "he wasn't thinking." During defen-dant's trial, defendant did not dispute that he made those statements to his stepfather and the stepfather's wife.

Defendant's only witness at trial was a psychologist who was retained after defendant's arrest to evaluate and "provide a diagnosis" of defendant. She conducted a clinical interview with defendant and diagnosed him with autism spectrum disorder. She also testified that "mind blindness" is a term used to describe some people with autism spectrum disorder who "are unable to form an awareness of other peo-ple's thoughts or beliefs or intentions," and that "the function of mind blindness[] would cause someone to assign blame regardless of a person's intent." That is, they assign "blame to individuals who intended no harm, failing to distinguish between intent and outcome." She did not, however, as part of her diagnosis, "assess [defendant's] mind blindness," but she noted that "most people with autism have difficulty" in that area.

To briefly recap, at defendant's trial, the only person who had personal knowledge of defendant's conduct and tes-tified before the jury was M. The jury also saw video of the statements that M made to Bell and Lovejoy. M's description

of defendant's sexually abusive conduct was materially consistent in both her testimony and the video recordings.

Additionally, uncontroverted evidence reflected that defendant apologized for his conduct, said he was ashamed of his conduct, and said that he was guilty of the charges against him. And he wrote a letter to M's mother, his former intimate partner, after the charges were pending against him, in which he stated that he had "failed her."

The record also contained evidence that defendant has autism spectrum disorder and at times engaged in conduct—specifically, slapping M's buttocks and tickling her—that made M feel uncomfortable.

B.   *The Theories at Trial*

The state's theory of the case was relatively straightforward: Defendant touched M while she was sleeping for his own sexual gratification in violation of ORS 163.427. In support of that theory, the state called, among others, the witnesses described above (other than the psychologist), who provided the foregoing testimony. The state argued that M was credible, highlighting for the jury the "consistencies of the core details" of M's description of defendant's touching in her recorded statements and her trial testimony, and arguing that she did not "express an axe to grind against defendant" and, in fact, had some positive things to say about him. The state highlighted that, during her interviews with the police, M never "aggravate[d]" the situation by claiming there was "penetration" or "force used" against her.

Defendant did not contest that he had inappropriately touched M while she was sleeping on the couch. Instead, he argued that he had touched her inappropriately in an effort to get her to move off of the couch, rather than for a sexual purpose. Accordingly, in his opening statement, defendant acknowledged to the jury that "there's no question [defendant] touched M inappropriately." But defendant argued that he knew M did not like being "slap[ped] on the butt" and, therefore, his admittedly inappropriate touching of her as she slept was to "try[] to get her off the couch."

Defendant further explained to the jury during his opening that he has "high-functioning autism," is "socially

awkward," "socially inept," and "doesn't pick up on social cues." Defendant argued that that diagnosis and those features of his personality explained the seemingly inculpatory comments that he made. Defendant argued that the jury should view his inculpatory statements as an acknowledgement by defendant that "I probably should not be touching [M] at this particular location," rather than an admission regarding sexual purpose. Defendant similarly noted that his apology and statement that he felt ashamed reflected that he "obviously" knew that the "kind of contact" he had with M was "bad," but again argued that that did not mean the contact he had with M was for the purpose of his own sexual gratification.

Defendant also advanced a theory that the police investigation of M's allegations was insufficient. As defendant pitched it to the jury, police were "so focused on [an] adult male touching [a] teenager's butt" in response to M's disclosure of defendant's conduct that they had "blinders on" and did not figure out the circumstances surrounding the contact. Defendant noted, for example, that police did not appropriately follow up with the first person to whom M reported the abuse, seize the blanket that was on the couch where M had been sleeping, search for semen, or ask M to demonstrate how she had been lying on the couch or how the couch's pillows were arranged. Defendant also at one point highlighted that the police never tried to confirm with M what she was wearing at the time of the alleged abuse to understand the precise nature of what occurred and whether M's description was physically possible:

> "But when they have a description from the girl about what happened, wouldn't you want to know that the type of clothing that she has on, that that would actually have been physically been able to do it? Do you even know as you've heard all the statements today on video, testimony exactly what happened as far as his hand? Was it down—would it come from the top of those pants or was it under? Was it like this leg, was it the thigh and then he touched her butt area a little bit coming up that way, or was it through the pants? You don't know. It was that they never clarified that.

> "And so wouldn't that be better to have the information say, oh, these are the kind of pants that it is so I can say,

yeah, okay, I can figure out how it was done, I can say, yes, that is really possible or, no, because if you're talking tight pants, where are the hands gonna be? And can they go whatever direction in doing that?

"So that's the lack of police investigation. They are like oh, no, we don't really need that information. We have her word. They just basically look at the girl's word, and they're like just gonna go with that. And I'm not saying, oh, that she's wrong in telling the police or that she's wrong or anything like that. That's not our argument here. Our argument for what the purpose is. But when they're making that determination, it's the officer and the government's job to provide the information that you can make a decision beyond a reasonable doubt. Not speculation, not probably but beyond a reasonable doubt."

Defendant also noted the evidence regarding other incidents where defendant had slapped M's buttocks or tickled M and asked the jury to consider that that was all that defendant had been doing during the incident in question—that is, to infer from the evidence of prior touching that defendant's conduct was not sexually motivated:

"The State has the burden to prove the case, every single element by beyond a reasonable doubt. What the main element here is the crux of this case, is that it was for a sexual purpose. At the end of the day, you're gonna hear that there is evidence that he wanted to - - he told her to get off the couch, that she needed to go to bed. You're gonna hear evidence that Mother had told her in the past, 'You need to go to bed.' You're gonna hear evidence in the past that they've said, hey, she's bothered by being pinched, being slapped on the butt. And so when you pinch and slap somebody on the butt, it makes her annoyed so that she would get up. And so we're gonna be asking you to consider that that's a possibility, that's it's not necessarily proven that it's for a sexual purpose. And if you don't find that, then you have to find him not guilty of these charges."

To recap, during defendant's trial, the state's theory was that, consistent with M's recorded statements and her trial testimony, defendant touched M on or near the buttocks under her clothes while she was sleeping for his own sexual gratification. Defendant's theory was that he had touched M inappropriately, which explained his inculpatory

statements, but the state had not proven that the contact was for a sexual purpose. Defendant suggested to the jury that M was perhaps incorrect about the nature of the touching. But he told the jury that it was not wrong for M to tell the police about what occurred, and he never argued that M was lying or intentionally exaggerating with respect to defendant's conduct.

C.    *The Claimed Evidentiary Error*

With that understanding of the case and the parties' theories, we turn to the asserted evidentiary error.

After M disclosed defendant's conduct and provided the recorded statements to Bell and Lovejoy regarding defendant's conduct, but prior to defendant's trial, in separate and unrelated juvenile delinquency proceedings, the state alleged that M had committed acts that, if committed by an adult, would constitute crimes.

During defendant's trial, prior to defendant's cross examination of M, defense counsel argued that she should be allowed to introduce evidence of M's pending juvenile adjudications to show that M had a motive to testify favorably on behalf of the state. Specifically, defendant argued that the pending juvenile adjudications "provide a basis to argue that [M] is being influenced to give this kind of testimony and a possibility that that would help her in her disposition on her juvenile cases." The state agreed that defense counsel should be able to use those pending adjudications to establish bias.[4]

The trial court noted that the legal problems facing M occurred "substantially after the accusations [against defendant] were made," and it failed to "see how [it] could have been preordained by [M] *** 21 months ago that she was going to be adjudicated and would need to curry favor from the state" with her testimony. The court stated regarding "bias as to bringing the allegations in the first place against the defendant, the fact that she's now subsequently *** been adjudicated is not relevant and is more prejudicial than probative."

---

[4]  The state also noted that it planned to attempt to rebut the cross-examination for bias, explaining its view that there was "literally no evidence of" bias.

The court ruled that, if M's testimony was consistent with her earlier statements, defendant could not use the delinquency proceedings to impeach her in-court testimony, but left open the possibility that defendant could do so if M's testimony differed from her prior statements regarding defendant's conduct.

## II. ANALYSIS

As noted, on appeal, defendant contends that the trial court erred "in prohibiting defendant from cross-examining [M] about her pending juvenile adjudications for the purpose of establishing bias." The state concedes that the trial court erred but contends that that error was harmless. For the reasons that follow, we accept the state's concession, and we conclude that the trial court's error was harmless.

A.   *The trial court erred in excluding evidence of M's pending juvenile adjudications.*

Under OEC 609-1(1), "a party is entitled to make an initial showing of bias that presents sufficient facts from which the factfinder may infer bias, and, if the court attempts to curtail that inquiry before the initial evidentiary threshold is met, the court commits legal error." *State v. Lulay*, 290 Or App 282, 292, 414 P3d 903, *rev den*, 363 Or 283 (2018) (internal quotation marks omitted). Further, "in a criminal case, the right to impeach a witness for bias or interest is secured to criminal defendants by the Oregon and United States constitutions as part of the right to confront witnesses." *State v. Nacoste*, 272 Or App 460, 467-68, 356 P3d 135 (2015).

"One well-recognized category of bias evidence is evidence that a witness has a reason to curry favor with the prosecution, or is under the influence of the prosecution, because of the witness's own criminal conduct ***." *Id.* at 468. Such evidence "includes evidence that the witness is on probation, has pending charges, or is the subject of a criminal investigation." *Id.* at 469.

Here, the state concedes that, by precluding defendant from eliciting any evidence regarding M's pending juvenile adjudications, the trial court prevented defendant from

making an initial threshold showing of the reasons that M would have for currying favor with the state at the time of her testimony at trial. Although we agree with the trial court that the pending juvenile adjudications would have no independent probative value as to the veracity of M's initial allegations against defendant, those adjudications could potentially establish that her trial testimony was biased. It was error to exclude them.

B.  *Excluding evidence of M's pending juvenile adjudications was harmless.*

Under Article VII (Amended), section 3, of the Oregon Constitution, a reviewing court must affirm a judgment "notwithstanding any error committed during the trial" if the court concludes "that the judgment of the court appealed from was such as should have been rendered in the case[.]" Under that provision, "we must affirm a defendant's conviction despite evidentiary error if there is little likelihood that the particular error affected the verdict." *State v. Jones*, 274 Or App 723, 728, 362 P3d 899 (2015) (brackets and internal quotation marks omitted). Whether an evidentiary error is harmless is a legal question. *State v. Ramoz*, 367 Or 670, 703, 483 P3d 615 (2021).

In conducting our harmless error analysis, "we focus on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *State v. Ramirez*, 310 Or App 62, 67, 483 P3d 1232 (2021) (internal quotation marks omitted). That is, "we do not usurp the role of the factfinder and determine if defendant is guilty or reweigh the evidence." *Id.* at 68.

Regarding the erroneous exclusion of evidence relevant to bias or interest, in *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984), the Supreme Court explained that such error is reversable error "if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial." Thus,

"if numerous other witnesses testified to a given fact, then the exclusion of evidence of a witness' bias or interest who

testified to the same fact might be 'harmless error' in the context of a given trial. But where the impeached witness is the sole witness on a given issue and there is no corroborating evidence, the interests of a fair trial require that the adverse party be given ample opportunity to establish the witness' bias or interest."

*Id.*; *see also State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999) ("[U]nder *Hubbard*, the trial court's error in this case would be harmless if either: (1) despite the exclusion, the jury nonetheless had an adequate opportunity to assess [the witness's] credibility; or (2) [the witness's] credibility was not important to the outcome of the trial.").

In assessing harmlessness, the Supreme Court and this court have considered, among other points, how the excluded evidence of potential bias fits with the defendant's theory of the case; whether anything in the context of the legal error indicates that the jury, in deciding whether the state had carried its burden of proof, would have regarded the excluded evidence as duplicative or unhelpful to its deliberations; the defendant's admissions; and whether other witness testimony corroborated the allegedly biased witness's testimony. *See, e.g.*, *Titus*, 328 Or at 482 ("Based upon that independent evidence of defendant's guilt and the testimony corroborating [the witness's] allegations, we conclude that the erroneous exclusion of the impeachment evidence concerning [the witness] was not likely to have affected the outcome of this case below."); *State v. Tyon*, 226 Or App 428, 443, 204 P3d 106 (2009) (error not harmless where erroneously excluded evidence of witness's alleged bias went "directly to the heart of defendant's factual theory of the case," and "nothing about the context of the legal error here indicates that the jury, in deciding whether the state had carried its burden of proof, would have regarded the excluded evidence as duplicative or unhelpful to its deliberations" (internal quotation marks omitted)); *State v. Najibi*, 150 Or App 194, 207, 945 P2d 1093 (1997), *rev den*, 326 Or 464 (1998) (erroneously excluded evidence of a witness's potential bias was harmless where two other witnesses, physical evidence, and defendant's admissions corroborated the allegedly biased witness's testimony).

In this case, viewed in the context of the record as a whole, we conclude that there is little likelihood that the particular error—preventing defendant from cross-examining M about her pending juvenile adjudications—affected the verdict. That is because, given the evidence in the record and defendant's theory at trial, impeaching M's trial testimony for bias when that testimony was consistent with her prior statements would have had minimal, if any, probative value as to the live factual issue in the case—*viz.*, whether, when defendant inappropriately touched M, he did so with a sexual purpose as the state contended (and the jury found) or whether he did so merely to get M to move from the couch (as he argued).

As noted, M's recorded interviews, in which M provided a detailed account of defendant's sexually abusive conduct, and which were admitted as substantive evidence of defendant's conduct under OEC 803(18a)(b), were conducted prior to the pendency of the juvenile adjudications. M's accounts of defendant's sexually abusive conduct in those recordings were materially consistent with her trial testimony. And, although M's pending juvenile adjudications would support an argument that M was biased in favor of the state in giving her testimony at trial, as the trial court observed, when M made the allegations against defendant and provided the recorded statements to the police, she could not have been influenced by a motive to curry favor with the state due to the adjudications because they were not yet pending.

Further, given defendant's trial strategy, the evidence of potential bias during M's trial testimony would not have been relevant to whether the jury should find M's account of defendant's conduct credible. As noted, defendant's trial strategy—which was perhaps a necessity due to his numerous inculpatory statements, such as that he was "guilty"—was to admit to having touched M inappropriately while she was asleep but deny any sexual purpose. Consistent with that strategy, defendant never argued to the jury that M was lying, that she intentionally exaggerated when she described defendant's conduct, or that she should not have reported his conduct to the police. In fact, during

closing argument, he told the jury: "I'm not saying, oh, that she's wrong in telling the police or that she's wrong or anything like that. That's not our argument here." In short, given defendant's trial strategy, we do not think that evidence of potential bias during defendant's trial, bias which arose *after* M accused defendant, would have had probative value for the jury as to M's veracity when she described the abusive conduct in the two recorded interviews or described it materially consistently with those interviews at trial. Therefore, we conclude that the evidentiary error had little likelihood of affecting the verdict.

On appeal, defendant contends that the "nature and scope" of defendant's touching of M was a contested issue at trial. To support that argument, he points to, among other things, his statement that the state failed to prove what clothing M was wearing to show that he "would actually have been physically been able to do it" and his statement that "when you pinch and slap somebody on the butt, it makes her annoyed so that she would get up, *** so we're gonna be asking you to consider that that's a possibility, that's it's not necessarily proven that it's for a sexual purpose." Considering the record as a whole, we do not understand defendant to have made an effort to impugn that M actually believed what she told the police and the jury: As noted, defendant expressly told the jury he was not saying "she's wrong or anything like that," nor did he cross-examine M regarding the "nature and scope" of the inappropriate contact. Given that trial strategy, on this record, we do not think impeaching M's trial testimony for bias would have been helpful to defendant in contesting the "nature and scope" of the touching.

We also note that recorded statements provided the jury with a means of assessing M's credibility in describing defendant's abusive conduct by allowing it to observe first-hand M's demeanor and the manner in which the interviews where she disclosed the abuse to the state were conducted. *See State v. Simon*, 294 Or App 840, 854, 433 P3d 385 (2018), *rev den*, 365 Or 502 (2019) (CARES interview that "described in detail the precise conduct to which defendant subjected" the victim to "not only corroborated [the victim's] in-court

testimony, but provided the jury with a direct means of assessing [the victim's] credibility by observing firsthand her demeanor and the manner in which the interview was conducted"); *State v. Jasperse*, 310 Or App 703, 712, 487 P3d 402, *rev den*, 368 Or 787 (2021) (noting the "jury had a significant quantity of evidence from which to assess [the victim's] credibility in disclosing the abuse" where the jury "could assess [the victim's] credibility from her grandmother's description of the [abuse] disclosure, from [the victim's] testimony at trial (including her detailed descriptions of the abuse), and from [the victim's] statements during the two CARES interviews").

For the above reasons, we conclude that there is little likelihood that the error affected the verdict in this case. We do note that we think it will be a rare case where we can conclude that the erroneous exclusion of evidence relevant to a victim's bias is harmless where the victim and the defendant are the only witnesses to a crime, and the defendant does not testify. But here, in view of the timing of M's recorded statements to police (*i.e.*, before the potential bias arose), that those recordings were materially consistent with her trial testimony as to defendant's conduct and were admitted as substantive evidence, and that defendant's trial strategy—perhaps due to the numerous inculpatory statements he made—was to acknowledge that he had inappropriate contact with M's buttocks and was not to argue that M was lying or had intentionally exaggerated during her statements to police, we conclude that the error was harmless. Put another way, given those features of this case, we do not think the error "denie[d] the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial," *Hubbard*, 297 Or at 800; M's credibility during her testimony was not important to the outcome of the trial.

Affirmed.